ALVA McCLELLAN, APPELLANT, v. MARY C. OLIVER, ADMINISTRATRIX OF THE ESTATE OF AMELIA SIMCOE, DECEASED, WILLARD SMITH, ET AL., RESPONDENT.—181 S. W. (2d) 784.

Kansas City Court of Appeals. December 6, 1943.

410

*Baker & Baker* for appellant.

*Hulen & Sappington* for respondents.

## On Rehearing.

SPERRY, C.—This suit was instituted by Alva McClellan, plaintiff, against Mary C. Oliver, administratrix of the estate of Amelia Simcoe, deceased, the living brothers and sisters of deceased, and the descendants of deceased brothers and sisters of Amelia Simcoe, deceased. Plaintiff sought a decree declaring her to be the adopted daughter of Amelia Simcoe.

Petition was filed July 31, 1937. Service of process was had on defendants, and the cause was continued from time to time and term to term thereafter until after this court handed down its decision in the case of Smith v. Oliver, 157 S. W. (2d) 558. On March 5, 1942, Willard Smith filed his motion to be made a party defendant, which motion was allowed. Thereafter, plaintiff filed amended petition and respondents filed motion to strike certain portions thereof, which motion was, by the court sustained. Defendant Smith filed answer, it being a general denial. Thereafter, plaintiff filed reply to answer of Smith. The court sustained motion to strike plaintiff's reply. Thereafter plaintiff filed motion for judgment, which motion was stricken. On June 12, 1942, the case went to trial and, after all evidence had been heard, the court found the issues against plaintiff and entered a decree accordingly. Plaintiff appeals.

A proper understanding and disposition of all of the issues here presented requires a rather full statement and discussion of the history of this litigation, of the pleadings, and of the facts developed in evidence.

Plaintiff, before her marriage, was Alva Smith, and is a sister of Willard Smith. Their mother died when Willard was less than two years of age. Shortly thereafter their father placed plaintiff with his sister, who was the mother of Mrs. Simcoe, and placed Willard with Mrs. Simcoe. About a year later, when plaintiff was approximately twelve years of age, she was taken into the home of Mr. and Mrs. Simcoe, both now deceased. Both Willard and plaintiff remained in the Simcoe home until they were fully grown and were married. Neither was formally adopted. In 1936 Mrs. Simcoe died intestate and without having borne any children. Her estate was of a net value in excess of $8000. Both plaintiff and her brother filed suit against the administrator of the estate, and against the brothers and sisters, and the descendants of deceased brothers and sisters, of Mrs. Simcoe, wherein they sought decrees of adoption.

Plaintiff, in her petition, pleaded:

"Plaintiff further states that when she was an infant about ten years of age, about the 15th day of December, 1892, the said Amelia Simcoe took plaintiff from her parents and from those having charge, care, custody and control of plaintiff, and took plaintiff into her household, promising to the parents of plaintiff and those having her charge and control that she would take plaintiff as her child, adopt her, make her her heir and in all matters and things treat her as her own and natural child; that upon such promises and upon said agreement plaintiff was given to the said Amelia Simcoe to be adopted by her."

She also pleaded that she lived in the Simcoe home until she was married and that she was encouraged to believe that she was an adopted daughter and was so held out to the world by Mrs. Simcoe; and that plaintiff rendered to Mrs. Simcoe the affection and services of a daughter throughout her life. She prayed the court to enter its decree declaring plaintiff to be the adopted daughter of Mrs. Simcoe.

On a trial of the issues in the suit filed by Willard Smith the trial court decreed that he had been equitably adopted by Mrs. Simcoe. During the pendency of that litigation, and until after the decree became final, the instant case remained on the circuit court docket and was continued from term to term. After the decree became final and when this cause was called up for trial, after Smith had been made a party to this suit, plaintiff herein filed an amended petition. The allegations of the original petition were set out and, in addition thereto, plaintiff pleaded a contract, made between herself and Willard Smith prior to the trial of the Willard Smith case. She alleged that it was agreed thereby that plaintiff and Willard Smith would aid each other in their respective cases, that their respective attorneys should select and try one only of the two cases, and that the other case would not be tried but would abide the result of the trial of the one so selected; that the attorneys of both should aid in the trial of the case so selected to be tried; that each should bear half of the costs and expense of the trial of said case; that if the party whose case was tried should be adjudged to be the adopted child of Mrs. Sincoe, he or she should share with the other the estate so gained; and that a decree of adoption should be entered in the case which was not tried. She alleged that plaintiff had fully complied with the terms of said contract; and that, by reason thereof, Smith was estopped to deny plaintiff's adoption. She alleged that, although her case was filed first it had been continued from time to time, pending trial and final judgment in the Willard Smith case, with an agreement between attorneys of all parties that it was to await and abide the final judgment in the Willard Smith case. She also alleged that, since the decree of adoption in the Smith case had become final, he is now really the only interested party defendant in the instant case, and that it would

be inequitable and work a fraud not to declare her to be an adopted daughter of Mrs. Simcoe.

This new matter, so alleged in the amended petition, was stricken on motion of defendant Smith. Smith filed general denial and plaintiff filed reply thereto, wherein she made, in substance, the same allegations as those contained in the new matter set up in her amended petition, and alleged that she and Smith agreed to "work together and share equally in the proceeds, work and expenses. . . ." She pleaded that Smith should be estopped to deny that plaintiff should share equally with him in the estate. The reply was stricken on motion.

Thereafter, plaintiff filed "Motion for Judgment," wherein appear substantially the same recitals as are in her amended petition and reply. She offered to prove the allegations contained in her motion if same were denied. Motion to strike the motion for judgment was sustained and the case proceeded to trial upon the issues made by the original petition and the general denial.

Plaintiff claims error on the part of the court in striking the new matter alleged in the amended petition, and the reply and motion for judgment. Defendants contend that the contract pleaded is unlawful and void because against public policy and that it ought not be recognized or enforced by the court on any ground.

It will be noted that plaintiff alleged in substance, both in her mended petition and in her reply, that she and Smith agreed to select and try one case only, the stronger of the two; that each hire and pay attorneys therein; that each would pay half of the expense incurred in prosecuting said case; and that they would "work together and share equally in the proceeds." It is also noted that she did not allege in either of these instruments that any of the parties to the litigation then pending, other than she and Smith, had full knowledge of the terms of said agreement; but she did allege that ". . . it was agreed by and between the plaintiff and all parties hereto . . . that only the Willard Smith case would be tried and that plaintiff's case would await and abide the final judgment in the Willard Smith case, whatever it might be; . . ."

It is thus seen that plaintiff did not allege, in the motion for judgment, or anywhere else, that all parties were fully informed of the terms of the agreement between herself and Willard Smith, which agreement she pleaded in her amended petition and in her reply. In other words, she pleaded fully the terms if her agreement with Smith but, as to agreement of all parties, it was only alleged that they agreed that her case was to be continued and abide the judgment of the Willard Smith case, not that all parties were cognizant of the *full* terms of her agreement with Willard Smith, or that all parties had agreed to the full terms of the Smith-McClellan agreement.

Both parties refer, in their briefs filed herein, to the record of Smith v. Oliver, 157 S. W. (2d) 558, decided by this court. Both agree

that there is evidence in the record of that case tending to prove the existence of some contract between Smith and plaintiff; but they disagree as to the particulars and special effect of such evidence.

Defendant has set out, in his briefs herein, a part of the testimony of plaintiff, given in that case, as follows: "A. We just made an agreement that as long as our witnesses would be practically the same, what was the use of having two trials? We just consolidated the two trials. . . . Q. If Willard recovers, what do you get under the consolidated agreement? A. Half of it. Q. You get one-half of it? A. Yes."

The trial judge who passed on the pleadings hereinbefore mentioned also heard the testimony of plaintiff in the Smith case relative to the contract and its terms. Both parties have invited this court's attention to said testimony. The trial judge, as well as this court, was fully informed of the terms of the contract as pleaded and as proved by the testimony of plaintiff. The question here presented is: Did the court err in refusing to enforce said contract? We think not. The contract was void as against public policy. The contract between plaintiff and Smith, as pleaded, speaks for itself. No parol evidence is needed by way of explanation. If any such evidence is needed then plaintiff, herself, furnished it by her own testimony in the Smith case. She said that she and Smith had consolidated the cases and that if Smith won his suit she was to receive one-half of what he gained. That, coupled with the pleaded contract, establishes fully that they were to work together to win Smith's case, share equally in the expenses of the litigation, and that Smith was to give plaintiff one-half of the proceeds of his suit.

Plaintiff and Smith were not in a position similar to that of two or more persons who are claimants against a common opponent (as in tax cases, or check cases against a closed bank), who stipulate with their adversaries that one case shall be tried and others shall abide the final judgment in the case tried. Such stipulations are favored by the courts. There, all claimants are seeking *full* remuneration from a common defendant. There, they are all adversaries of the common defendant, but are *not* adversaries of each other. Here, each pleaded that he or she was the *sole* adopted child of Amelia Simcoe. If one should be declared to be an adopted child he or she would, unless the other should also be declared to be an adopted child, take title to the whole of the estate. From a financial standpoint it was advantageous to each of the parties here to be adjudged the *sole* adopted child of Amelia Simcoe. If Smith alone succeeded in establishing his claim, he would get the whole of the estate; but if both Smith and plaintiff succeeded in their separate suits, each would receive but one-half of said estate. Therefore, from a financial standpoint, these parties were adversaries. Their financial interests were not identical in any respect.

Such is not the situation in ordinary cases where contracts or stipulations of this kind are entered into.

It has been held that people who are closely bound together by ties of blood, family or affection may legally assist each other, in an honorable way, in litigation; but it is not permissible for them to do so for gain of a part of the matter litigated. [Taylor v. Perkins, 171 Mo. App. 246.] It is not necessary that a contract of this character be entered into with a bad motive on the part of any of the parties in order that it be against public policy and void; it is only necessary that such a contract have a corrupt tendency. The question is rather fully discussed in Ridenbaugh v. Young, 145 Mo. 274, where the court said, l. c. 280:

" 'Agreements relating to proceedings in civil courts involving anything inconsistent with the full and impartial course of justice therein, though not open to the charge of actual corruption, are void.' [3 Am. and Eng. Ency. of Law, 879, 881.] It is said that 'all agreements for pecuniary consideration to control the regular administration of justice are void as against public policy, without reference to the question whether improper means are contemplated or used in their execution.' [Tool Company v. Norris, 2 Wall. l. c. 56.] Greenhood on Pub. Policy (page 5), lays down the rule as follows: 'The question of the validity of the contract does not depend upon the circumstances whether it can be shown that the public has in fact suffered any detriment, but whether the contract is, in its nature, such as might have been injurious to the public. It matters not that any particular contract is free from any taint, or actual fraud, oppression or corruption. The law looks to the general tendency of such contracts.' In speaking of contracts of this character in Woodstock Iron Co. v. Extention Co., 129 U. S. 663, Mr. Justice FIELD said: 'They are against public policy because of their corrupt tendency, whether lawful or unlawful means are contemplated or used in carrying them into execution.' So in Tool Company v. Norris, 2 Wall. l. c. 56, it is said: 'The law looks to the general tendency of such agreements; and it closes the door to temptation, by refusing them recognition in any of the courts of the country.'

"In the suit by George W. Young to set aside and annul the will of his deceased father, the plaintiff in this suit, Mary T. Ridenbaugh, being the only other heir at law, and George Young Ridenbaugh being a devisee under said will, must of necessity have been made parties defendants thereto, and yet under this state of facts the contract here sued on, to which George Young Ridenbaugh is not a party, was entered into by two apparent adversary parties without the consent of a co-defendant of one of them, and by it Mary T. Ridenbaugh was to be paid a moneyed consideration by the contestant of the will out of his share of the estate, in the event he succeeded in annulling the will."

In the case at bar there is no escaping the fact that two apparently adversary parties contracted to aid each other, each to pay half of the expenses of the lawsuit and each to receive half of the proceeds. *This* contract was entered into between plaintiff and Smith. This is, actually, the contract sought to be enforced. Such a contract is, in its nature, injurious to the public. Smith could not, legally, testify in his own behalf as to any contract of adoption; but his sister could legally so testify in his behalf. She did, in fact, testify to pertinent facts, within her knowledge, which were calculated to aid Smith's case. The fact that there is no suggestion that she testified falsely, is not the point. Such a contract as was made surely had a tendency to tempt her to use unlawful means to aid Smith. It is for that reason that the law "closes the door to temptation" by refusing recognition to such contracts in any of the courts of the country.

The final issue to be considered is whether or not the evidence establishes a contract of adoption such as should be enforced by a court of equity.

The facts established by the evidence of plaintiff are virtually undisputed by defendant, who offered no evidence. They are: that plaintiff was one of eight children; that her mother died when she was about ten or eleven years of age; that the children then ranged in age from about one year to nineteen years; that, a few months thereafter, plaintiff's father took plaintiff to the home of his sister, Mrs. Craig, who was the mother of Mrs. Simcoe, and left her; that he, at about the same time, gave Willard Smith into the care and custody of Mrs. Simcoe; that he placed others of the children, in other homes, and took two of the older ones with him and left that part of the country; that plaintiff's father was not heard from by her until more than twenty years thereafter; that a year or more after plaintiff was left in the home of Mrs. Craig, the latter became ill and was unable to longer keep her, and that Samuel Simcoe, deceased's husband, went to the Craig home, took plaintiff and brought her to the Simcoe home; that she remained in the Simcoe home continuously thereafter until her marriage, almost twenty years later; that deceased at all times treated her with motherly affection and referred to her as her "girl" and as "Daught"; that she sent her to school and college; that she requested plaintiff, when the latter was married, to establish her home close to where deceased then lived so that plaintiff might be near her; that plaintiff always, throughout deceased's lifetime, treated deceased with the same affection that a daughter would have shown to a mother; and that plaintiff's child was habitually referred to by deceased as her grandchild, and that she often spoke of her plans to send him to college. There is no doubt but that plaintiff and deceased each performed their full duty toward each other and that their relation very closely approached that of mother and daughter; but there was no evidence tending to prove that deceased ever promised anyone that

she would adopt plaintiff as her child. No evidence was offered which tended to prove that deceased ever told anyone that she either had adopted plaintiff or would adopt her.

The gist of the contract pleaded in this case has been set out herein, *supra*. In Furman v. St. Louis Trust Company, 338 Mo. 884, 92 S. W. (2d) 726, l. c. 731, the following language, taken from Wales v. Holden, 209 Mo. 552, 108 S. W. 89, l. c. 96, was quoted with approval:

"When a court of equity is invoked to enforce an oral contract void under the Statute of Frauds on the ground of part performance, it recognizes and appreciates the danger that the statute was designed to avoid, and grants relief only when it is sure, beyond a reasonable doubt, that to refuse its aid would result in allowing the statute to be made in that case an instrument to protect fraud. A court of equity therefore requires that a part pesformance relied on to take the case out of the statute should be of a character, not only consistent with the reasonable presumption that what was done was done on the faith of such a contract, but also that it would be unreasonable to presume that it was done on any other theory."

In the same opinion the court also quotes, with approval, the following language from Grantham v. Gossett, 182 Mo. 651, 81 S. W. 895, l. c. 899, to-wit:

"In all the cases of this kind that have come before this court we have held that, to sustain the alleged oral contract, the proof must be so clear, cogent, and convincing as to leave no reasonable doubt in the mind of the chancellor, not only that a contract of the general nature alleged was made, but that the particular contract as alleged was made, and its terms and conditions clearly shown."

There is no evidence concerning any contract such as is pleaded. In fact, the evidence discloses that Samuel Simcoe, not Amelia Simcoe, actually brought plaintiff to the Simcoe home. The evidence tends to prove the positive fact that the reason plaintiff was taken to the Simcoe home was because Mrs. Craig was no longer physically able to keep plaintiff, not that plaintiff was taken into the Simcoe home under and by reason of a promise to adopt. There is not a scintilla of evidence to the effect that deceased ever at any time stated to any one that she would, expected to, or had adopted plaintiff. The testimony, as a whole, is more in harmony with the theory that deceased took plaintiff into her home in order that plaintiff, a homeless orphan, should have a home, rather than with any theory of adoption. The evidence falls far short of being so cogent and convincing as to leave no room for reasonable doubt that a contract of adoption was made; and certainly it fails to establish the specific contract pleaded.

The judgment should be affirmed. *Boyer, C.,* dissents.

PER CURIAM:—The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. The judgment is affirmed. *Shain, P. J.,* and *Bland, J.,* concur; *Cave, J.,* not sitting.